UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:21-mj-03160-Reid

**UNITED STATES OF AMERICA**

vs.

**JESUS GABRIEL RODRIGUEZ, JR.,**
             **Defendant.**         /

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?      ___Yes  _X_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? ___Yes _X_ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? ___Yes _X_ No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By:  *Walter M. Norkin*
     Walter M. Norkin
     Assistant United States Attorney
     Court ID No. A5502189
     11200 NW 20th Street
     Miami, Florida 33172
     Tel: (305) 961-9406
     Walter.norkin@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| JESUS GABRIEL RODRIGUEZ, JR., | ) | Case No. 1:21-mj-03160-Reid |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 2015 through Sept 2016__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent William L. Donaldson, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date: June 14, 2021

_____
*Judge's signature*

City and state: Miami, Florida    Hon. Lisette M. Reid, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, William L. Donaldson, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1. I submit this application in furtherance of an investigation worked with the Drug Enforcement Administration (DEA), the Internal Revenue Service (IRS), and Department of Homeland Security Investigations (HSI).

2. I am a Special Agent ("SA") in the Miami Division of the Federal Bureau of Investigation ("FBI"). I have served in this capacity for nearly five years. I am currently assigned to a white-collar crime squad and have experience conducting various complex financial crime investigations, including investigations of schemes involving money laundering, mortgage fraud, bank fraud, wire fraud, and securities fraud. Additionally, I have attended numerous classes, seminars and training lectures in the investigation of criminal violations of federal laws. I hold a Bachelor of Business Administration degree in Accounting with a minor in fraud examination, and a Master of Accounting degree with an emphasis in forensic accounting. I am also a Certified Public Accountant and Certified Fraud Examiner.

3. Based upon the information provided below, I respectfully submit that probable cause exists to believe that from in or around March 2015 to in or around September 2016, JESUS GABRIEL RODRIGUEZ, JR. (hereinafter, "RODRIGUEZ"), and others conspired to commit money laundering, specifically to transport, transmit and transfer funds from a place in the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified

1

unlawful activity, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A). The specified unlawful activity included:

   a. The entry of goods by means of false statements, in violation of Tile 18, United States Code, Section 542; and

   b. An offense against a foreign nation, that is, a violation of the laws of Curacao against illegal mining, false statements in customs declarations, and gold smuggling.

4. Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the affidavit each and every fact known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

5. The statements contained in this affidavit are based on my investigation, information provided by others, and on my experience and training as a federal agent and that of other agents participating in the investigation, including agents of the FBI, the DEA, the IRS, HSI, and U.S. Customs and Border Protection (CBP).

## PROBABLE CAUSE

### A. Background

6. In recent years, Miami emerged as a major international gold trading hub, particularly for Latin American gold, both legal and illegal. The majority of gold imported into the U.S. enters through the Miami International Airport (MIA), and several major gold refineries operate in South Florida.

7. Beginning around March 2015 and continuing until approximately September 2016, RODRIGUEZ and others conspired to commit money laundering by sending billions of dollars from the United States to Latin America and the Caribbean with the intent to promote the

2

carrying on of organized criminal activity, including illegal gold mining, gold smuggling and the entry of goods into the U.S. by false means and statements, and narcotics trafficking.

8. RODRIGUEZ undertook this conspiracy in connection with his role as the Chief Executive Officer (CEO) and President of Transvalue, Inc. (Transvalue),[1] an armored car service. Transvalue provides armored transport, customs clearance, and brokerage services of gold and other precious metals. Using its fleet of armored trucks, Transvalue picked up gold shipments at MIA and transported them to several different South Florida gold refineries, including NTR.[2]

9. As a precious metals refinery, NTR buys unrefined precious metals, such as mined gold, refines it, and sells it for profit. The profit margins are small, often less than 0.5% of the value of the gold refined. So, to increase profits NTR must buy and refine as much gold as possible. In March 2017, NTR pled guilty to a felony Information charging the company with failing to maintain an adequate anti-money laundering program, in violation of Title 31, U.S.C., Sections 5318 and 5322. *See United States v. Elemetal, LLC*, 18-CR-20173-FAM. As part of the plea, NTR agreed to forfeit $15 million. *See id.*, DE 12 at 7-8. NTR also agreed to cooperate with any ongoing investigations and it should be noted has cooperated in the instant investigation that has led to the charge against RODRIGUEZ. (Though NTR is discussed here, there is no allegation

---

[1] Transvalue is an armored car service which, according to its website, operates a fleet of twenty (20) armored trucks in South Florida and offers cash processing, cash in transit, and small package shipping services domestically. The company also offers international transport services, including transport of bank notes and "Precious Metals, Precious Stones, Jewelry, Credit Cards, Data Tapes, and other such valuable commodities." Transvalue, was founded in 1992 and is headquartered in Miami, Florida.

[2] "NTR" or "NTR Metals" or "Elemetal" is the brand name of what is now Elemetal LLC, a precious metals company which, according to its website, "melt[s], mint[s], sell[s], ship[s], and store[s] precious metals around the world." NTR is headquartered in Dallas, Texas with, at various times relevant to this Complaint, offices around the world, including a Miami office located in Doral, Florida.

3

of NTR participating in any unlawful conduct subsequent to its guilty plea and agreement to cooperate.)

10. In addition to the company, several former employees of NTR were prosecuted. *See United States v. Barrage, et al.*, 17-CR-20215-RMS. Through their employment at NTR, those defendants facilitated the sending of billions of U.S. dollars from the United States to South America with the intent to promote the carrying on of organized criminal activity, including illegal gold mining, gold smuggling and the entry of goods into the U.S. by false means and statements, and narcotics trafficking. As explained in this affidavit, RODRIGUEZ knowingly played an integral part in the scheme.

B. **Illegal Gold Mining, Smuggling & Money Laundering in Latin America**

11. Illegal gold, mined in violation of foreign law, is a significant problem throughout Latin America and particularly in the Andean region, where illegal mining is responsible for the devastation of large swaths of rainforest. Because illegal mining occurs in remote jungle areas, it is difficult to access and difficult to police, and it is often controlled by organized crime and smuggled along the same routes as narcotics. Often, illegal mining is supported by human trafficking, forced adult and child labor, and prostitution in and around mining camps. Areas in which illegal miners burn down the rainforest and strip away the surface of the earth remain barren because of contamination from chemicals such as mercury used in the mining process.

12. The international gold trade has also become a common method for the laundering of illegal mining, narcotics, corruption, and other criminal proceeds. Criminals frequently trade illegal gold through illicit shell or front companies using false or incomplete documents. The gold is often smuggled through third-party countries and then sold to refineries in the U.S. in an effort to hide the true source, ownership, and origin of gold from foreign and U.S. law enforcement.

Gold is a particularly good medium for money laundering because it has universal and readily ascertainable value and is difficult to trace. Once the gold arrives at the refineries, the criminals receive wire transfer payments into the bank account of their choice. On the surface, the payment appears to be for a legitimate gold-sale transaction, and not from any underlying criminal activity.

13. Several Latin American countries have initiated illegal gold, money laundering, and smuggling investigations, some of which involve gold that was part of the scheme described here. In addition, the United States government has sought to stem the flow of illegal gold mining and smuggling, and the corruption that is supported by those crimes, by targeting some of the best-known sources of the crimes. For example, in approximately November 2018, the President of the United States "signed an executive order to ban anyone in the United States from dealing with entities and people involved with 'corrupt or deceptive' gold sales from Venezuela[.]" *See* "Trump increases pressure on Venezuela with sanctions on gold," Roberta Rampton, Steve Holland (Reuters Nov. 1, 2018), available at https://www.reuters.com/article/us-usa-venezuela-bolton/trump-increases-pressure-on-venezuela-with-sanctions-on-gold-idUSKCN1N65P6.

14. With respect to gold that was processed by NTR, United States Customs import records, as well as NTR's own records, confirmed NTR's involvement in highly suspicious transactions and trends between 2013 and March 2017. Specifically, NTR imported over $3.6 billion dollars worth of gold from Latin America and the Caribbean from 2012 through 2016.

15. Cooperating witnesses ("CWs") and other evidence confirm that NTR, together with RODRIGUEZ and other co-conspirators, knowingly conspired to purchase gold with the intent to promote the carrying on of organized criminal activity, including illegal gold mining, gold smuggling and the entry of goods into the U.S. by false means and statements to U.S. Customs, and narcotics trafficking.

C.     **Summary of the Illegal Gold Smuggling & Money Laundering Conspiracy**

16.    NTR's salespersons promoted new business and found more gold to purchase by "smiling and dialing," that is, by learning who had gold to sell, making introductions, forming customer relationships, and making sales pitches designed to win new business. For all of the billions of dollars' worth of gold shipped from Latin America and the Caribbean to NTR in Miami, NTR sent billions of dollars in wire payments to Latin America and the Caribbean from the United States. In effect, NTR promoted its clients' business with fast payments, and promoted the Latin American and Caribbean gold trade in general with billions of dollars of wire transfers.

17.    The NTR salespersons and others conspired to send or cause to be sent these international wires with the intent to promote further gold transactions and businesses they knew involved: organized crime, gold smuggling and entry of goods into the U.S. by false means and statements, illegal mining, and narcotics trafficking, all in the hopes of creating more profits for themselves and NTR.

18.    Between March 2015 and September 2016, NTR imported thousands of kilograms of gold worth more than $141 million into the United States from a company that was located in the Cayman Islands (hereinafter "Company A"). In each instance, the same gold was reported to U.S. Customs as having originated in Curaçao, and a few days later reported to U.S. Customs as having originated in the Cayman Islands. RODRIGUEZ and Transvalue assisted NTR salespersons and Company A in deceiving U.S. Customs by facilitating the movement of the gold through customs at MIA both when it transited between Curaçao and the Caymans, and again when it arrived back in Miami from the Caymans. RODRIGUEZ also assisted the scheme by having his company, Transvalue, physically transport the gold from MIA to NTR when it arrived from the Caymans.

### D. The Statements of Cooperating Witnesses

19. Interviews of several CWs with personal knowledge of the events have confirmed the criminal conspiracy among RODRIGUEZ and others. The CWs were co-conspirators of RODRIGUEZ who were charged for their participation in the conspiracy, pled guilty, and cooperated in an effort to reduce their punishment. The statements of the CWs, as described below, were corroborated by independent evidence.

20. CW1 was an employee of NTR at the time of the conspiracy and he/she explained how the conspiracy worked, including RODRIGUEZ's involvement in the scheme. During debriefs, CW1 stated, in sum and substance, that Company A owned a facility in the Caymans and provided NTR gold that was imported from Curaçao. However, as Curacao had no mines, it was understood by the co-conspirators that the gold was likely brought to Curacao from Venezuela. Indeed, for this reason – the likelihood that gold was illegally mined and smuggled out of Venezuela – NTR would not accept gold that was listed as originating in Curaçao. NTR had an anti-money laundering ("AML") policy that specifically prohibited gold from Curacao. CW1 told Company A about NTR's AML policy forbidding purchases of gold from Curaçao and the co-conspirators then set about a plan to evade that policy, hiding the fact that the gold originated in Curacao.

21. As part of that plan, Company A flew the gold from Curaçao into MIA with couriers, who hand-carried the gold on these flights. Upon arrival to MIA, a customs broker cleared the gold through U.S. Customs. Initially, this broker was hired by Company A. But, as time went on and NTR and Company A continued in their business dealings (with NTR not aware the gold was coming from Curacao), the broker was hired by RODRIGUEZ and Transvalue.

7

22. Even though the gold was in Miami at that point and could be brought to NTR, after clearing customs, the courier immediately boarded another flight to the Cayman Islands and transported the gold there. Company A provided flight information for its couriers to CW1, who then coordinated the flights with RODRIGUEZ and other Transvalue employees. Once the gold was in the Caymans, CW1 notified RODRIGUEZ and Transvalue when Company A's shipment was going to be arriving back in Miami from the Caymans. CW1 usually did this via an email to a Transvalue employee. CW1 copied RODRIGUEZ on these emails. Over the time period of the conspiracy, Company A typically shipped gold from Curaçao to Miami to the Caymans and back to Miami twice a week. (As discussed below, documentary evidence, including flight records and emails in the possession of law enforcement, corroborate CW1's statements about the operation of the conspiracy.)

23. CW1 explained that RODRIGUEZ was aware that the gold coming into Miami from Company A did not originate in the Cayman Islands, but was in fact the same gold that had come in from Curaçao a few days earlier. If Transvalue sent an invoice to NTR for Company A's shipments from Curaçao to Miami, NTR employees would reach out to RODRIGUEZ to change the invoices and thus conceal that the gold was coming from Curacao since NTR would not purchase gold from Curaçao.

24. CW2 was an employee of NTR at the time of the conspiracy, specifically between March 2015 and September 2016, and he/she explained how the conspiracy worked, including RODRIGUEZ's involvement in the scheme. During debriefs, CW2 stated, in sum and substance, that Company A informed CW2 that their gold was coming from Curacao. CW2 agreed that they should not list Curacao as the country of origin since NTR's AML policy would not allow NTR's

8

salespersons to purchase that gold. However, CW2 explained that all the co-conspirators then engaged in a plan to evade the AML policy.

25. CW2 and other co-conspirators were aware that the gold was likely being illegally mined and smuggled out of Venezuela. For example, CW2 stated that he/she overheard a telephone call when Company A received a shipment from Curacao and, in unpacking the shipment of gold, expressed that the gold smelled like gasoline, suggesting it had been stored in a gas tank and brought into Curaçao by boat. In another instance, Company A's representative admitted to CW2 that the gold sold to NTR was from Venezuela and would transit through Curaçao. That same representative mentioned Venezuelan suppliers to CW2 when they discussed price locks for expected gold deliveries.

26. CW2 further explained that CW1 set up an arrangement with Transvalue to ship Company A's gold from Curaçao through Miami to the Caymans and back to Miami. Under this arrangement, NTR would not pay Transvalue's invoice for the shipment from Curaçao to Miami, as that would alert NTR to the fact that the gold was coming from Curacao. Rather Company A would pay RODRIGUEZ and Transvalue for that part of the trip. But RODRIGUEZ was thus aware that the gold was going back and forth – to, from and back to Miami – and on a few occasions a Transvalue employee even accompanied Company A's couriers from Curaçao. CW2 added that Transvalue hired a customs broker to clear the gold through U.S. Customs and cleared the same gold through customs twice: first when it came from Curacao and second when it returned to Miami from the Caymans, only transporting it from MIA to NTR after the second time it was cleared.

27. CW2 clarified that RODRIGUEZ understood that the purpose of routing the gold from Curaçao to Miami, then to the Cayman Islands and back to Miami was to conceal the gold's

9

true country of origin. RODRIGUEZ also understood that concealing the gold's Curaçao origins was done to evade NTR's AML controls, since CW2 explicitly told RODRIGUEZ that NTR could not purchase gold from Curaçao. CW2 noted that, at one point, NTR accidentally received an invoice that listed Curaçao as the country of origin for a gold shipment. CW2 then sent a text message to RODRIGUEZ stating, "we can't receive gold from there. Change invoice." RODRIGUEZ replied with a text message stating, "OK". (These text messages have been preserved and are in the custody of law enforcement.) Based on this text message, among other reasons, your affiant has reason to believe that RODRIGUEZ knew the true origins of the gold, and willingly participated in concealing the gold's true origin.

28. Notably, the Curacao gold shipments were not the only instances where RODRIGUEZ and the co-conspirators engaged in conduct to hide the gold's true origin and thus get around NTR's AML policy. Company A in other instances purchased gold from locations in Africa and similarly routed it through the Cayman Islands to disguise the gold's source. In those instances, Transvalue was again hired to get the gold to the Cayman Islands and then to Miami. In a meeting with CW2, RODRIGUEZ and others, the co-conspirators discussed the transport plan and CW2 again made it clear that NTR policy was not to accept any gold from Africa. Knowing this, the co-conspirators, including RODRIGUEZ, agreed to disguise the source of the gold by stating that it originated in the Cayman Islands.

29. CW3 was an employee of NTR at the time of the conspiracy and he/she explained how the conspiracy worked, including RODRIGUEZ's involvement in the scheme. During debriefs, CW3 stated, in sum and substance, that NTR had a policy forbidding the purchase of gold from Curaçao because the country had no mines, and most of the gold sold there originated in Venezuela. CW3 stated that he/she knows from conversation with CW2 that RODRIGUEZ was

told by CW2 that NTR could not purchase Company A's Curaçao gold directly, but they could purchase it if it appeared that it came from the Caymans. RODRIGUEZ, CW2 and other co-conspirators worked out a plan whereby Company A would import gold from Curaçao to the Caymans through Miami, then NTR would purchase it from Company A in the Caymans. The import paperwork would say that the gold was from the Caymans. There were no direct flights between Curaçao and the Caymans, so the gold was routed through MIA, where the courier changed planes and flew immediately to the Caymans. NTR purchased gold from Company A in this manner for about two years.

30. CW3 added that Company A representatives complained to RODRIGUEZ about the costs of flying the gold from Curaçao to Miami to the Caymans and back. All the co-conspirators, including CW3 and RODRIGUEZ, were aware that the Curacao gold was really coming from Venezuela because a Company A representative mentioned that fact several times at various points during the conspiracy. CW3 also stated that, he/she is aware from conversations with CW2 that CW2 directly told RODRIGUEZ that the Curaçao gold was from Venezuela.

31. CW3 noted that Company A's couriers hand-carried the gold on the flights from Curaçao into Miami, then from Miami to the Caymans. They usually flew out to the Caymans the same day, but sometimes they missed the flight and RODRIGUEZ would store the gold at Transvalue overnight, thus again showing he was aware that the gold was moving back and forth without a legitimate business purpose. CW3 added that RODRIGUEZ was aware of Company A's Curaçao shipments and wanted their business. RODRIGUEZ specifically asked CW3 to tell Company A to bring the Curaçao gold business to Transvalue.

32. Corroborating the other CWs, CW3 noted that Transvalue often paid for the customs broker to clear the gold through customs and RODRIGUEZ was aware of that, including

11

the fact that the same gold was clearing customs multiple times. In fact, with the gold having to make so many voyages, RODRIGUEZ would often be the person coordinating the transport and logistics of the flights.

E.  **Emails and Other Communications Corroborating the CWs and Revealing RODRIGUEZ's Involvement in the Scheme**

33. Law enforcement obtained access to internal NTR emails and Transvalue documents. A review of the emails showed that CW1 coordinated the logistics of Company A and NTR's Curaçao-to-Miami-to-Caymans-to-Miami scheme. Part of this coordination involved engaging Transvalue to help the gold clear U.S. Customs when it transited through Miami. CW1 notified Transvalue when a shipment of gold was inbound from Curaçao and provided the flight information, courier name, and estimated shipping weight. CW1 would also hire Transvalue to store the gold in case the courier missed his flight out of Miami. The emails then show Transvalue sending a bill for services. Many of those documents show RODRIGUEZ's involvement.

34. For example, on April 25, 2016, CW1 sent an email to customs brokers indicating an upcoming flight on April 29, 2016 and requested that Transvalue "Pls schedule a pick up & clearance[.]" The email also referenced a transfer flight, and advised that the requested pickup service might be canceled if the transfer flight did not occur. CW1 promised to keep everyone posted regarding the status of the transfer flight. On that same day, that email was forwarded to various Transvalue employees. U.S. Customs records closely track the scheduling done by CW1 and Transvalue. Import records show that on April 28, 2016, a shipment of 118.012 kilograms of gold with a value of $4,730,581 was hand-carried into MIA from Curaçao. The importer was NTR Metals, and the country of origin was listed as Curaçao. U.S. Customs export records show that on April 28, 2016, a shipment of gold of the same weight and nearly identical value ($4,730,580) was hand-carried out of MIA. The "US Origin State" was listed as "FL.". The "Ultimate

Destination" listed was the Cayman Islands. The listed "Filer Name" associated with the export was "<u>Jesus Rodriguez</u>" (emphasis added). Completing the round-trip transaction, U.S. Customs import records further show that on April 29, 2016, a shipment of 118.013 kilograms of gold with a value of $4,837,340 was hand-carried into MIA from the Cayman Islands. The listed manufacturer was Company A and the listed importer was NTR Metals. But now, the country of origin was listed as the Cayman Islands. Transvalue then emailed bills for its various services, including customs clearance, and attached U.S. CBP Forms 3461 and 7501 to the emails. The forms were filed with U.S. Customs as part of clearing the gold into the U.S. on April 29, 2016, and list the gold as having originated in the Cayman Islands. RODRIGUEZ was copied on the emails.

35. In addition to the shipments described in detail above, a review of U.S. Customs records and Transvalue's own billing records indicates that Transvalue facilitated the movement of gold from Curaçao through Miami to the Caymans and back to Miami on behalf of Company A and NTR on nine additional occasions between May 2016 and September 2016 under similar circumstances, with the gold going in and out of Miami and then back to Miami on very quick turn-around flights, with weights and values of the gold indicating that the same gold was going back and forth.

36. Between April 2016 and September 2016, Transvalue was involved in 11 shipments for NTR and Company A in which Transvalue handled shipment and customs clearance both when the gold arrived at MIA from Curaçao and when the same gold returned to MIA from the Caymans. In total, these shipments resulted in the importation of more than 893 kg of gold valued at $37,014,472.

37. The co-conspirators took steps to conceal the fact that each shipment of gold NTR bought from Company A in the Caymans had originated in Curaçao just days earlier. Among these steps was avoiding association with any paperwork that listed Curaçao as the country of origin for any of the shipments. On several occasions, emails were accidentally sent to NTR personnel with customs forms showing the gold's true origin. For instance, on May 16, 2016, an email to multiple employees at Transvalue, including RODRIGUEZ, was sent and copied NTR employees. This was problematic because documentation showing gold originating in Curaçao conflicted with NTR's AML policy of not buying gold from that country. Another similar email was sent on May 31, 2016, and again RODRIGUEZ and NTR employees were copied on that email. That second email drew a swift response from CW3 at NTR.

38. Minutes after receiving that email, CW3 forwarded to RODRIGUEZ the offending email and wrote, "Please have them not cc on these or bill us." No one else was copied on this email – it was solely between CW3 and RODRIGUEZ. It is particularly telling that CW3 made this request directly to RODRIGUEZ and did not engage with a customs agent. This highlights RODRIGUEZ's role as a key participant in the scheme and demonstrates that he exerted a level of control as it pertained to these transactions.

39. Notably, the May 31, 2016 email was not the first time RODRIGUEZ and CW3 had engaged in a conversation on this topic. Their conversation over concealing the scheme actually began at least a week earlier when CW3 and RODRIGUEZ discussed it over the messaging service WhatsApp.

40. In WhatsApp text messages exchanged between CW3 and RODRIGUEZ between May 24 and May 26, 2016, CW3 requested that RODRIGUEZ take steps to hide NTR's involvement in importing gold from Curaçao:

14

<u>May 24, 2016</u>

CW3: Call me back on whatsapp please.

<u>May 25, 2016</u>

CW3: Good morning jay. Can you please have all those invoices voided please. We cannot and must not be billed for those shipments from that area. Please re bill to [Company A]. Please confirm.

RODRIGUEZ: Confirmed, just like we spoke yesterday evening.

CW3: Ok thanks and any previous one as well.

RODRIGUEZ: Yes.
RODRIGUEZ: Confirmed.

CW3: Thanks

<u>May 26, 2016</u>

CW3: Jay good morning, can you please have those [Company A] invoices voided for us and have the voided invoices sent to us.

It is clear from RODRIGUEZ's responses and his reference to an earlier verbal conversation that he was an active participant in the scheme with the CWs, and actively participated in concealing the source of the gold.

F.  **U.S. Customs Data Showing the Scheme**

41. A review of U.S. Customs import records shows that between 2015 and 2016 Company A and NTR repeatedly imported gold from Curaçao to the U.S. through MIA and immediately sent the gold to the Cayman Islands. They then reimported the same gold into the U.S. from the Cayman Islands days later. Customs records show that, over an 18-month period, Company A and NTR routed gold shipments in this manner approximately 75 times.

42. According to U.S. Customs import records, between March 2015 and September 2016, Company A imported 3,772,533 grams of gold from Curaçao into the U.S. via MIA. The

gold had a reported total value of $144,082,757. During the same period, NTR imported 3,704,919 grams of gold from the Cayman Islands into MIA, with a total reported value of $141,856,765. Approximately 98.2 % of all gold (by weight) and 98.4% (by value in U.S. dollars) imported into MIA from Curaçao by Company A was later reimported from the Caymans into MIA by NTR. The individual shipments returned to MIA from the Caymans within an average of two days. The longest interval before an individual shipment of gold returned to MIA from the Caymans was five days.

43. Below is a graphical representation of U.S. Customs export data depicting gold exports from Miami to the Cayman Islands between 2012 and 2017. As the graph makes clear, Company A accounted for nearly all of the gold exported from Miami to the Caymans, with nearly all of those exports occurring during 2015 and 2016.



U.S. Customs import data for gold imported into Miami from the Cayman Islands during the corresponding period shows a remarkably similar pattern:

16



44. U.S. Customs import and export data clearly shows that the booming gold trade between Miami and the Cayman Islands in 2015 and 2016 existed almost solely as a byproduct of the steps taken by the CWs, RODRIGUEZ, and Company A to conceal the origins of gold that originated in Curaçao, and Venezuela before that.

45. The CWs and Company A could not have accomplished this scheme without RODRIGUEZ, who assisted by moving the gold through customs at MIA when it arrived in the U.S. from Curaçao, and again when it returned to the U.S. from the Caymans.

**CONCLUSION**

46. Based upon the information provided above, I respectfully submit that probable cause exists to believe that from in or around March 2015 to in or around September 2016, JESUS GABRIEL RODRIGUEZ JR., and others conspired to transport, transmit and transfer funds from a place in the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A). The specified unlawful activity included:

17

a. The entry of goods by means of false statements, in violation of Tile 18, United States Code, Section 542; and

b. An offense against a foreign nation, that is, a violation of the laws of Curacao against illegal mining, false statements in customs declarations, and gold smuggling.

47. In summary, gold was unlawfully imported into the United States in violation of the laws of both the U.S. and Curacao. RODRIGUEZ was aware of the gold entering the U.S. unlawfully and in fact he assisted in this endeavor. Thereafter, because the gold was successfully sold to NTR, money was wired from the U.S. to the Cayman Island and additional gold movements occurred – into the U.S. from Curacao, from the U.S. to the Cayman Islands and from the Cayman Islands into the U.S. These wire transfers of money and subsequent gold transports were all done to promote yet additional unlawful gold importation. RODRIGUEZ was aware that, in undertaking actions to assist his co-conspirators in the unlawful gold importation, it would cause both the wire transfers and additional transportation of gold, including further unlawful importation of gold into the U.S.

Respectfully submitted,

_____
WILLIAM L. DONALDSON
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this __14th__ day of June 2021.

_____
THE HON. LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

18